[Civ. No. 15922.   First Dist. Div. One.   Sept. 28, 1954.]

NORMAN A. SAUNDERS et al., Appellants, v. CITY OF SAN MATEO, Respondent.

Millington, Dell'Ergo & Morrissey and J. D. Lederman for Appellants.

Ropers & Majeski for Respondent.

BRAY, J.—In an action for personal injuries brought pursuant to section 53051, Government Code, charging negligent maintenance and control of Laurel Creek causing it to overflow and deposit silt upon the sidewalk in front of plaintiffs' premises, plaintiffs appeal from a judgment of nonsuit.  The sole questions presented are whether there is any evidence, or any reasonable inference from the evidence, which would have supported findings by the jury (1) that Laurel Creek constituted "Public Property" of the city of San Mateo within the meaning of said section, and (2) whether the material upon which plaintiff Catherine slipped came from Laurel Creek.

## BACKGROUND

Plaintiffs lived on Branson Drive in San Mateo Village Unit No. 2, a subdivision of the city of San Mateo. About 1949 this subdivision and San Mateo Unit No. 1 were taken into the city. Prior to the construction of said subdivisions the area was low lying land into which Laurel Creek debouched from the hills. Through this area the creek fanned out into several channels and thence into two or three culverts under Bayshore Highway. The city manager testified that before acceptance of the subdivisions by the city it required that Laurel Creek be channelized into one channel and the other channels filled. Thereafter the creek crossed under Bayshore Highway in an arch shape culvert approximately 6½ feet high at the center of the arch and approximately 14 feet wide at the base. This was the situation when the subdivisions came into the city. In the winter of 1950-1951 there were heavy rains. This culvert would not take all the water that came down the creek, due partly to the bottom of the culvert filling up two or three feet with silt. The creek overflowed. (To what extent does not appear.) The city hired a Los Angeles company to haul out this silt. The city found out in the winter of 1950-1951 that the culvert was not adequate, and planned to install other culverts, but they were not constructed. In December, 1951, and January, 1952, the rainfall broke a 60-year record. Plaintiff's accident happened January 15, 1952. For four days prior, the rainfall averaged more than an inch per 24 hours.

Plaintiffs' home is approximately four blocks from the Laurel Creek culvert. In December, 1950, water flooded about halfway onto the lawn. Around Thanksgiving and in December, 1951, water flooded Branson Drive. (Where this water came from does not appear.) On the Thursday prior to Tuesday, January 15, 1952, the street was flooded and remained so until Monday night. The water was so deep that plaintiffs' neighbor waded in it up to her waist. The water came over the curb and into plaintiffs' garage, which is higher than the curb. The water was so high that plaintiff Catherine was unable to leave her home from Thursday until Tuesday. Tuesday morning she walked across her lawn and onto the sidewalk. The grass was wet but there was no water on the sidewalk or street. There appeared to be dry dirt on the sidewalk. "It wasn't gummy or muddy or anything like that." She took one step on the sidewalk, slipped and fell, breaking her arm.

## 1. *Public Property.*

While it is true that there was no direct evidence of ownership by the city of Laurel Creek or the culvert, there is substantial evidence upon which the jury might have found such ownership, or at least that they were a public property of which the city had assumed control and maintenance. The city had required before the area was annexed that the natural channels of the creek be reduced to one and that the culvert at Bayshore Highway be constructed. Thereafter, the city assumed control of the creek and culvert and their maintenance. In addition to the work of cleaning the silt out of the culvert the city manager testified that the creek was given "the usual maintenance by the city street department." Although the city manager testified that the culvert was cleaned in 1951 by a Los Angeles concern, and that the 1950-1951 flood filled the bottom of the culvert with "two to three or possibly more feet of silt, cutting down the capacity of the culvert," the assistant city engineer testified that the culvert was hard to get to and required special equipment, and that the culvert was not cleaned in 1951. Plaintiff Norman testified that he examined the culvert in January, 1951, and that it "had a good majority of silt in it, of course, tree roots, limbs, Christmas trees, kids' toys and quite a collection of almost anything you would want to find, old pots and pans, basketballs." Cullimore, a neighbor of plaintiff, testified that after the flooding of the area in December, 1951, and before plaintiff's accident, the village association had a number of meetings with the city engineer and the city council attempting to find a temporary solution to prevent further flooding. While he did not expressly mention Laurel Creek it is obvious that it was the flooding of that creek which was the subject of the meeting, as he testified that the temporary expedient discussed was to run a ditch through the school grounds "to take the overflow that was running into the Village and run it around the culvert, along the culvert line of the culvert . . ." He further testified that the city representatives admitted that the creek had not been cleaned, but gave no reason for not doing so.

From the evidence, the jury reasonably could have inferred that the flooding of the creek was due to the failure of the city to keep the creek and culvert clear, and that the creek was public property over which the city had control.

## 2. *Where the Material Came From.*

A more serious question is whether the evidence shows that the material upon which plaintiff slipped came from Laurel Creek. No one testified directly that either the water which flooded Branson Drive or its contents came from that source. Defendant points out that the accident happened during the rainy season and that the rain which fell for several days prior to the day of the accident was unusually heavy and that floods could be caused from numerous causes other than a creek overflowing its banks. However, Cullimore stated that in the meeting with the city officials they discussed means *"to take the overflow that was running into the Village . . ."* (emphasis added.) Unfortunately, no one testified how far it ran into the village, nor where, with reference to Branson Drive. The city manager testified that "during the periods of great intensity of rain, the culvert was submerged." He further testified that from their experience with the rainfall intensity in 1950-1951 and again in 1951-1952 they were required to change their views as to the adequacy of Laurel Creek. The assistant city engineer testified that after the accident silt was cleaned out of the creek. Thus, there was ample evidence that Laurel Creek did flood, but the extent of that flooding was not given. The fire chief testified that the day of the accident he saw "silt and other deposits" on the sidewalk at plaintiffs' location. A Mrs. Plescher stated that in previous floods when the water dried off it left "powdery dust," but the condition the day of the accident "looked like it was the same, but it was slimy underneath." Plaintiff Catherine testified that the only time any deposit was left on the sidewalk by the floods was at the time of the accident, and that the flood of December, 1951, was due to the fact that the water on Branson Drive did not drain into the sewer, and that the water did not come from the creek, although the evidence demonstrates that the creek overflowed at that time.

In discussing defendant's motion for a nonsuit, the judge said, "What I am trying to do is to find out who testified or who traced the water from Laurel Creek to the point where the lady slipped in front of her home. Has any witness done that?" Plaintiffs' counsel admitted that none had. There is no evidence as to whether plaintiffs' property is above or below the top of the bank of Laurel Creek, nor what water overflowing from the creek would or could flow

into Branson Drive, nor of the extent of the overflow. The only evidence which plaintiffs contend would have supported such a finding was the evidence that the waters and the material deposited by them which flooded Branson Drive were different than in any prior rain, and that there was similar material in the creek. Witness McDonald testified the material left on the sidewalk was "silt," plaintiff Catherine that it looked like "dry dirt," "looked just like brown dust, . . . and underneath it was dark and just like grease . . . it wasn't muddy" or "gritty," and it was "dust colored, crusty." The only references to the character of the material in the creek, other than refuse, were that it was "silt." There was no evidence that it was greasy, nor was there any comparison of the silt of the creek with that on the sidewalk. To judge that the "silt," "brown dust, . . . dark and just like grease," "dust colored, crusty" material on plaintiffs' sidewalk after days of rain heavy enough to flood the yards on Branson Drive and to cause them to be submerged for several days, and in the absence of evidence of the slope of the ground between the creek and Branson Drive, came from Laurel Creek, would be the highest type of guesswork. Certainly a rainfall that covered the yards and gardens of the neighborhood, leaving the occupants, as Mrs. Plescher and plaintiff Catherine say they were, marooned in their homes from Thursday to Tuesday, and then subsided, would carry with it much material of the nature of silt that came from the yards and gardens. Particularly is this so where the rainfall was as great as at the time in question. The area was formerly tideland and was filled in before being annexed. The trial court before granting the nonsuit directed plaintiffs' attention to the failure of proof. As there is no substantial evidence to prove that the material on which plaintiff Catherine slipped came from Laurel Creek, the court properly granted a nonsuit.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 24, 1954. Carter, J., was of the opinion that the petition should be granted.